## OSCAR TAMTE AND ANOTHER v. WILLIAM EDDY AND OTHERS.[1]

May 12, 1939.

No. 32,020.

*F. J. Rosemeier,* for appellants.
*Thomas H. Strizich,* for respondents.

Holt, Justice.

A controversy arose in the city of Virginia in respect to the mayor's right to veto resolutions passed by the city council in virtue of § 97-A of the city charter, and this action was brought by the mayor and by a taxpayer against the members of the city coun-

[1]Reported in 285 N. W. 720.

cil and the city for a declaratory judgment that the mayor does have such right. Two judges of the district court heard the matter and made findings of fact and conclusions of law. From the judgment entered thereon decreeing that the mayor of the city of Virginia does have the right and power to veto the resolution of the city council referred to in said findings and passed by the city council on the 20th day of September, 1938, defendants appeal.

The facts necessary to state are: The city of Virginia is governed by a home rule charter adopted in 1926. Chapter 5 thereof deals with the powers and duties of the city council. Section 73 reads: "The legislative power and authority of the city shall be vested in a city council, composed of the aldermen of the city as herein provided." Sections 81 and 82 refer to the procedure of presenting ordinances and resolutions after being passed by the city council to the mayor for approval and passing the same over his disapproval. Section 97 reads:

"POWER TO MAINTAIN BUILDINGS. It shall have power by two-thirds (2/3) vote of all the members thereof, to erect, provide for, improve and repair a city hall, fire halls, police stations, armories, jail, workhouse, poorhouse, hospitals, public cemeteries, libraries, markets, and market houses, public pounds, pest houses, quarantine hospitals, dumping places, dumping stations, sewer stations and other appurtenances, accessories, apparatus and equipments in connection therewith as may be necessary for the transaction of the business of the city, either within or without its limits for its government, or the operation of its departments; and to acquire by purchase, gift or condemnation lands for sites for said buildings or to be used in connection therewith; and to acquire by purchase, condemnation or otherwise, any real property for municipal purposes, and by resolution passed by a two-thirds (2/3) vote of all its members, to sell or authorize the sale of any of the same.

"The city council shall have power, by a two-thirds vote of all members thereof, to erect, equip and maintain, on the city hall site in said City of Virginia, a community building for civic, assembly, social and recreational purposes."

February 8, 1938, the charter was amended by § 97-A, reading:

"COMMUNITY BUILDING. AMENDMENT TO SECTION 97, CHAPTER 5 OF THE CHARTER OF THE CITY OF VIRGINIA RELATING TO POWERS AND DUTIES OF THE CITY COUNCIL.

"Section 97 of Chapter 5 of the City Charter is amended by adding thereto another section numbered 97-A as follows:

"Section 97-A. The City Council shall have the power by a majority vote of all of the members thereof to acquire by purchase, gift or condemnation, land for an additional public community building or buildings, to be used for civic, social and recreational purposes.

"The city council shall have the power, by a majority vote of all of the members thereof, to erect upon said land so acquired, or upon any other land owned by the city, an additional public community building or buildings to be used for civic, social and recreational purposes, and to equip and maintain said building or buildings, and do any and all things necessary and incidental in connection with the erection, operation, management and maintenance of said building or buildings so constructed.

"The city council shall have the power, by a majority vote of all of the members thereof, to construct any additional hospitals or additions to any hospitals, and to do anything necessary or incidental in connection with the construction thereof.

"The city council shall have the power, by a majority vote of all members thereof, to appropriate money, create any liability or authorize the issuance of any bonds of the city that may be necessary to purchase said land and/or to construct an additional community building or buildings and/or to construct any additional hospitals or additions to any hospitals.

"All provisions of the city charter that are inconsistent with this amendment are hereby repealed."

It is to be noted that § 97-A was an addition to § 97 and not a substitute therefor, or a repeal thereof, except insofar as inconsistent therewith. It amplifies § 97. It is inconsistent therewith only in respect to the vote required to pass a resolution or ordinance

in regard to the subjects specified, a majority instead of a two-thirds vote being sufficient. The matters enumerated in § 97 as well as those in § 97-A pertain to legislative powers and duties of the city council. Chapter 5 of the charter is replete with legislative powers and duties of the city council, for instance, § 99 thereof containing 73 subdivisions, some of which are so plainly legislative that there can be no doubt that an ordinance or resolution dealing therewith is subject to the veto power conferred on the mayor by §§ 81 and 82 mentioned. The only matter in § 97-A which may be claimed inconsistent with any other charter provision than § 97 is in respect to the issuance of bonds, which § 84 authorizes only upon a two-thirds vote, and § 97-A upon a majority vote. We think § 97-A should be considered to be what it in plain language purports to be, an addition to and amendment of § 97. As aptly said in the memorandum accompanying the findings:

"To the extent that it [§ 97-A] duplicates any grant of power contained in section 97 and to the extent of permitting the issuance of certain bonds by a majority vote, it repeals the requirements of sections 97 and 84 where a two-thirds vote is required. But we can see nothing in it inconsistent with the provisions of section 82 which provides for veto power in the mayor nor any evidence of intent to repeal that provision."

There can be no doubt that prior to the adoption of § 97-A the veto power of the mayor extended to every ordinance and resolution in respect of every legislative action taken by the city council upon any subject covered by § 97. In § 97-A there is no express repeal of the veto power given the mayor by §§ 81 and 82, and implied repeals are no more favored in charter amendments than in statutory amendments. 6 Dunnell, Minn. Dig. (2 ed.) § 8927. The veto power is so commonly conferred upon the chief executive of the city by home rule charters that courts should be reluctant to find in an amendment of one section of a charter an implied repeal of such power theretofore expressly granted. Especially should that be so here, where, instead of requiring a two-thirds vote of the city council to adopt an ordinance or resolution there is substituted

a simple majority vote, there is need of some check in respect to such important matters as those covered by § 97-A.

Appellants rely on Meyers v. Knott, 144 Minn. 199, 174 N. W. 842, and State ex rel. Wenzel v. May, 190 Minn. 336, 251 N. W. 529. The first mentioned case held that the charter provisions of the city of Minneapolis as to the veto power of its mayor did not apply to a general law (L. 1915, c. 124) enabling the city councils of cities of the first class not operating under a home rule charter to extend or renew street railway franchises. Under that law an ordinance passed by the city council granting such a franchise was of no effect until ratified by a majority vote of the electors cast at a general or special city election. That law [§ 1] provided that the city council "is hereby authorized, unrestricted by any provision of statute or charter, to grant a franchise," etc. This is somewhat different from the mere addition of a section to one already contained in a home rule charter. The May case related to the election or selection of a board of trustees under an act of the legislature creating a sanitary district embracing the cities of St. Paul and Minneapolis. By that act the city of St. Paul was empowered to elect or select two trustees for the governing board of the district, and it was held that the city council in electing such trustees was free from any veto power conferred on the mayor by the home rule charter provisions.

There is no occasion to consider the claim of respondents that the title to § 97-A is defective since we arrive at the conclusion that the section does not in any manner deprive the mayor of his veto right.

Judgment affirmed.

PETERSON, JUSTICE (dissenting).

This case is governed by Meyers v. Knott, 144 Minn. 199, 174 N. W. 842, 843, and State ex rel. Wenzel v. May, 190 Minn. 336, 251 N. W. 529. In Meyers v. Knott we used language which controls decision here [144 Minn. 203]:

"Under the charter of the city of Minneapolis the mayor is given the power of veto of legislative enactments passed and adopted by

the city council, and the veto when used annuls the enactment, unless subsequently repassed by the council by a two-thirds vote of its members. * * * To hold that the veto power of the mayor must be taken into account, and a proposed franchise submitted to him, would necessarily nullify that part of the enabling act which declares that a majority vote of the council is all that is necessary to a valid passage of the ordinance, and would result in adding to the enabling act by judicial construction the further provision 'that if the mayor shall veto any such proposed franchise, then to give it force or validity, or entitle it to submission to the voters, a two-thirds vote must be had to repass the same over the veto.' This the court is not authorized to do. It is clear that the legislature, in enacting the statute, did not intend that the mayor or other chief magistrate of the municipality acting thereunder should be an official factor in the proceedings at all. The act deals wholly with the city council, and there exists no sound reason why the mayor and his veto should take part. * * * The fact remains that the enabling act does not provide for a mayor's veto, and the court is without authority to read one into the statute."

The majority opinion fails to differentiate the May and Knott cases except in respect to facts which are not controlling.

Perhaps the Knott case was not decided rightly. Escape from its rule will be sought, as it is here, by differentiating it. The result is bound to be, as I think it is now, that the bar and the public do not know what our rule is.

Probably it would be better to overrule the Knott and May cases and announce a rule which will be clear and understandable and, I believe, supported by the weight of authority. But as long as we adhere to those cases we should follow the rule which they proclaim.

MR. JUSTICE HILTON, being incapacitated by illness, took no part.